UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JESSE PARKER,

                               Plaintiff,

          -against-

CITY OF LONG BEACH,
LONG BEACH POLICE DEPARTMENT,
JAMES CANNER,
MICHAEL BULIK, KARL HAYES,
and BRUCE AZUETA,

                               Defendants.
-------------------------------------------------------X

**MEMORANDUM AND ORDER**
11-CV-5412 (SJF) (WDW)

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   FEB 1 5 2013   ★

LONG ISLAND OFFICE

FEUERSTEIN, J.

On November 4, 2011, Jesse Parker ("plaintiff") commenced this action pursuant to 42

U.S.C. § 1983 ("section 1983") against the City of Long Beach, the Long Beach Police

Department (the "Police Department"), and several Long Beach police officers (collectively,

"defendants"), alleging that his civil rights were violated in the course of an encounter with

police officers on November 4, 2010. [Docket Entry Nos. 1, 17].

Plaintiff asserts claims for: (1) false arrest; (2) the use of excessive and unreasonable

force in violation of plaintiff's rights under the Fourth Amendment; (3) violation of plaintiff's

right to equal protection under the Fourth, Fifth and Fourteenth Amendments; (4) municipal

liability pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); and (5) negligence,

battery, and intentional infliction of emotional distress under state law.

Defendants now move for summary judgment pursuant to Federal Rule of Civil

Procedure 56. [Docket Entry No. 63]. For the reasons that follow, the motion is GRANTED.

1

## I.    Factual Background

In November 2010, Antonio Webb ("Webb") was a primary suspect in the Police Department's investigation of an armed robbery. Defendant's Statement of Uncontested Material Facts Pursuant to Local Rule 56.1 [Docket Entry No. 23-2] ("Def. 56.1 St.") at ¶ 1. Detective Lieutenant James Canner ("Detective Canner") had seen Webb numerous times and was familiar with Webb's appearance. Id. at ¶ 3. On November 4, 2010, Detective Canner saw an individual he believed to be Webb in the vicinity of 99 East Pine Street and instructed Detective Michael Bulik ("Detective Bulik"), who was accompanied by Police Officer Bruce Azueta ("Officer Azueta"), to respond to the area, identify Webb, and arrest him. Id. at ¶¶ 3-8.

Detective Bulik and Officer Azueta arrived in the vicinity of 99 East Pine Street in an unmarked police vehicle minutes later, at approximately 3:45 p.m. Id. at ¶ 10; Complaint [Docket Entry No. 1] at ¶ 20. Detective Bulik incorrectly identified Jesse Parker ("plaintiff"), Webb's brother, as Webb, and approached him upon exiting the vehicle. Def. 56.1 St. at ¶¶ 11-13.[1] Detective Bulik and Detective Canner have testified that the brothers possess similar facial features and thin builds. Id. at ¶ 13. Detective Bulik and Officer Azueta were wearing plain clothes and had their badges displayed. Id. at ¶¶ 9-10.[2]    According to defendants, Officer

---

[1]    Plaintiff characterizes Detective Bulik's and Officer Azueta's approach as a "jog[]," while Detective Bulik testified that their "gait . . . was a briskly-paced walk." Bulik Affidavit [Docket Entry No. 23-5] ("Bulik Aff.") at ¶ 13.

[2]    Plaintiff contradicts himself by admitting in his response to defendants' Rule 56.1 Statement that the officers were wearing badges, Pl. 56.1 St. at ¶ 9, but then stating that they "were not wearing badges to identify themselves" in his own statement of facts. See Plaintiff's Counterstatement of Material Facts ("Pl. 56.1 Ctr. St.") at ¶ 16. Whether plaintiff immediately recognized that Detective Bulik and Officer Azueta were police officers is irrelevant because flight may give rise to reasonable suspicion whether the suspect is fleeing from strangers or police officers. See Sibron v. New York, 392 U.S. 40, 66 (1967) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea . . . .") (emphasis added).

2

Azueta said to plaintiff, "Hey Tony, come here" (referring to Webb), and plaintiff responded, "What for?" Id. at ¶ 14. Plaintiff alleges that Detective Bulik and Officer Azueta did not address him as they exited the vehicle. Plaintiff's Statement of Disputed Facts [Docket Entry No. 23-27] ("Pl. 56.1 St.") at ¶ 14.

Plaintiff and his cousin, Anthony Rogers ("Rogers"), turned and ran into 93A East Pine Street, a nearby residence which Detective Bulik knew to belong to Mary Mann ("Mann"). Def. 56.1 St. at ¶¶ 15-20; Pl. 56.1 St. at ¶ 17. Detective Bulik testified that at the time he feared for Ms. Mann's safety. Bulik Affidavit [Docket Entry No. 23-5] ("Bulik Aff.") at ¶ 17. According to defendants, Detective Bulik and Officer Azueta verbally identified themselves as police officers and directed plaintiff and Rogers to stop when they began to run. Def. 56.1 St. at ¶ 16. Plaintiff alleges that he did not know that Detective Bulik and Officer Azueta were police officers "until after [plaintiff] entered Ms. Mann's apartment and locked the front door." Pl. 56.1 St. at ¶ 21.

Detective Bulik and Officer Azueta entered the Mann residence and encountered plaintiff in the kitchen. Def. 56.1 St. at ¶¶ 22-24. According to defendants, Detective Bulik and Officer Azueta handcuffed plaintiff while remaining in the standing position and conducted a safety pat down. Id. at ¶ 25; Azueta Affidavit [Docket Entry No. 23-5] ("Azueta Aff.") at ¶ 23; Bulik Aff. at ¶ 25. Plaintiff alleges that Detective Bulik "slammed" him to the floor and that, after applying handcuffs, Officer Azueta "choked" him for "three seconds." Pl. 56.1 St. at ¶ 26.

Plaintiff was then driven to police headquarters by Officer Azueta and Sergeant Karl Hayes ("Sergeant Hayes"). Id. at ¶ 27. On the way to headquarters, plaintiff told the officers that he was "not Tony," which prompted Sergeant Hayes to turn around from the front seat of the vehicle and see that plaintiff was not Webb. Id. at ¶¶ 29-30. Officer Azueta confirmed plaintiff's identity by inspecting his wallet. Id. at ¶ 31.

The vehicle was stopped in front of police headquarters and plaintiff's handcuffs were removed. Id. at ¶¶ 32-33.[3] Plaintiff was taken to a holding room where he was asked questions about his health and whether he needed medical attention. Id. at ¶ 34. Plaintiff indicated that he did not need medical attention and signed a physical condition questionnaire certifying his good physical health. Id.

Plaintiff's encounter with the police began at 3:45 p.m. and, according to defendants, plaintiff was escorted into police headquarters at 3:53 p.m. and departed at 3:59 p.m. Id. at ¶¶ 33, 35. The video surveillance footage submitted by defendants corroborates this timeline and contradicts plaintiff's allegation that he was kept in the back of the police vehicle for twenty (20) minutes before being driven to police headquarters and that he was kept in police headquarters for one (1) to one and one-half (1.5) hours. Pl. 56.1 St. at ¶¶ 33, 45.[4]

Plaintiff also alleges that the officers would not allow him to leave until he signed a physical condition questionnaire indicating that he did not need medical attention and that he did not tell the officers that he was injured "because [he] knew if he stated he was hurt, [d]efendants would take him to Long Beach Hospital where [he] did not want to go." Id. at ¶¶ 46-48. Plaintiff went to Mercy Medical Center hospital two (2) days after the incident, on November 6, 2010, to seek treatment for injuries to his back allegedly "caused by Defendant Bulik slamming

---

3       According to plaintiff, the handcuffs were not removed until after he entered police headquarters. Pl. 56.1 St. at ¶ 33. This assertion is contradicted by video surveillance footage.

4       As discussed in further detail below, because plaintiff's allegations are clearly contradicted by video surveillance, they do not create a genuine issue of material fact precluding the granting of summary judgment. See Cameron v. City of N.Y., 598 F.3d 50, 60 (2d Cir. 2010) ("When a movant presents '[i]ncontrovertible evidence . . . such as a relevant videotape whose accuracy is unchallenged,' we will grant the movant's motion for [summary] judgment . . . if that evidence 'so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.'") (quoting Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)).

4

[p]laintiff into the ground." Plaintiff's Counterstatement of Material Facts [Docket Entry No. 23-27] ("Pl. 56.1 Ctr. St.") at ¶ 103. Plaintiff was diagnosed with a "back strain" and "muscle strain." Declaration of Robert M. Agostisi [Docket Entry No. 23-23] Ex. K. Plaintiff's counsel in this case referred plaintiff to a physical therapist for back treatment and a licensed social worker for mental health treatment. Def. 56.1 St. at ¶¶ 40-42.

On November 20, 2010, Webb was arrested for the armed robbery and other charges and was convicted upon a plea of guilty on July 14, 2011. Id. at ¶ 36.

II.     Summary Judgment Standard

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).

"A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks omitted). "There is no genuine issue of material fact where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) (internal quotation marks omitted).

Although summary judgment should generally not be decided upon the basis of credibility assessments, Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010), "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account," Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). In such circumstances, "when the facts alleged are so contradictory that doubt is cast upon their plausibility" and it is determined that "no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint," summary judgment against the plaintiff is appropriate. Id. at 555 (internal quotation marks and alterations omitted); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

III.   Analysis

   A.   False Arrest

"In analyzing § 1983 claims for unconstitutional false arrest, [courts] . . . look[] to the law of the state in which the arrest occurred." Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006) (internal quotation marks omitted). To establish a claim for false arrest under New York law, plaintiff must show that: (1) defendants intentionally confined plaintiff; (2) plaintiff was conscious of the confinement; (3) plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. See Jocks v. Tavernier, 316 F.3d 128, 134-35 (2d Cir. 2003); Harris v. Cnty. of Nassau, 581 F.Supp.2d 351, 354–55 (E.D.N.Y. 2008). If the seizure

6

was proper under Fourth Amendment standards, it is privileged and cannot sustain a false arrest claim. Gil v. Cnty. of Suffolk, 590 F. Supp.2d 360, 366-67 (E.D.N.Y. 2008); Martinez v. City of N.Y., 340 F. App'x 700, 701 (2d Cir. 2009). Therefore, the existence of probable cause or reasonable suspicion (in the context of a stop-and-frisk, see Terry v. Ohio, 392 U.S. 1 (1968)) constitutes a complete defense to a false-arrest claim. See Covington v. City of N.Y., 171 F.3d 117, 122 (2d Cir. 1999).

According to defendants, "[p]laintiff's fifteen-minute encounter with Long Beach Police on November 4, 2010 amounted to a Terry stop, which was both reasonable and justifiable under the circumstances." Defendants' Memorandum of Law in Support of Motion for Summary Judgment [Docket Entry No. 4] ("Def. Memo.") at 4. Alternatively, defendants argue that even if the incident amounted to an arrest, defendants had probable cause to arrest plaintiff.

An officer may, consistent with the Fourth Amendment, briefly detain an individual for questioning "if the officer has a reasonable suspicion 'that criminal activity may be afoot.'" United States v. Colon, 250 F.3d 130, 134 (2d Cir. 2001) (quoting Terry, 392 U.S. at 30). "In evaluating whether an investigative stop is reasonable under the Fourth Amendment, the reviewing court must determine 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990) (quoting Terry, 392 U.S. at 20). Under this standard, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). During an investigatory stop, "[t]he investigating officer may also frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous." Colon, 250 F.3d at 134.

7

1.    Reasonable Suspicion

Detective Bulik and Officer Azueta had a particularized and objective basis for

suspecting that plaintiff was Webb, a suspect in an armed robbery, and therefore had a lawful

basis for conducting an investigative stop. Both Detective Canner and Detective Bulik were

familiar with Webb's appearance and have testified that plaintiff and Webb bore a strong physical

resemblance, and nothing in the record indicates that the officers were not acting in good faith or

that their mistake was not reasonable. See Bernard v. United States, 25 F.3d 98, 102 (2d Cir.

1994) ("Probable cause can exist even where it is based on mistaken information, so long as the

arresting officer acted reasonably and in good faith in relying on that information.'"); Hill v.

California, 401 U.S. 797, 803-04 (1971) ("[T]he officers in good faith believed Miller was Hill

and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would

not in itself justify either the arrest or the subsequent search. But sufficient probability, not

certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record

before us the officers' mistake was understandable and the arrest a reasonable response to the

situation facing them at the time.").

Plaintiff argues that differences in hair style and height should have alerted the officers

that plaintiff was not Webb and that the only characteristic the brothers share in common is their

race. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary

Judgment [Docket Entry No. 29] ("Pl. Memo.") at 7 ("Mr. Webb and Plaintiff's only physical

similarities were their race and color, as African Americans."). This argument fails, as it is clear

that Detective Bulik and Detective Canner focused their suspicion on plaintiff due to his

resemblance to Webb and were not stopping African American men in the neighborhood at

random. See Ortiz v. Village of Monticello, N.Y., No. 06-CV-2208, 2012 WL 5395255, at *9-10

(S.D.N.Y. Nov. 2, 2012) (rejecting the assertion of plaintiffs who were arrested upon the basis of mistaken identity that they were arrested merely because they "looked hispanic," noting that the evidence "demonstrate[d] that police were looking for a Hispanic male in his twenties who was specifically believed to reside" in a particular apartment, and that there was no evidence "indicating that police were searching [the area] for Hispanic males" generally). Plaintiff also asserts that "[p]laintiff and Webb's clothing were [] dissimilar, as [p]laintiff was wearing a black cotton t-shirt, while Defendant Canner reported that the person he observed was wearing a grey hooded sweatshirt and pants." Pl. Memo. at 8. In fact, the video surveillance footage of plaintiff arriving at police headquarters clearly shows him wearing a grey hooded sweatshirt, further indicating that plaintiff was not targeted for an investigative stop due to his race alone.

Even if plaintiff's physical resemblance to Webb alone was not a sufficient basis to conduct an investigative stop, when combined with plaintiff's flight, the officers had the requisite objective basis to pursue plaintiff and detain him for questioning. See United States v. Sharpe, 470 U.S. 675, 682 n.3 (1985) ("Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification" for an investigatory stop); Sibron v. New York, 392 U.S. 40, 66 (1967) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea . . . ."); United States v. Ceballos, 719 F. Supp. 119, 125 (E.D.N.Y. 1989) ("The defendants' flight in this case was the crest of a rising wave of suspicion. It justified the agents' decision to chase defendants and detain them for questioning."); United States v. Campbell, No. 06-CR-6025L, 2006 WL 3151032, at *2 (W.D.N.Y. Nov. 1, 2006) (holding that where the suspect fled, unprovoked, from officers and attempted to remove a metallic object

from his pocket "it was entirely reasonable for [the officer] to follow [the suspect] into the foyer to apprehend him").

        2.      Scope of Investigative Stop

Although justified at its inception, the Court must also determine whether plaintiff's detainment exceeded the proper scope of an investigative stop. United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) ("If an investigative detention is properly premised upon articulable suspicion, the next inquiry is whether its scope and duration are reasonable . . . , bearing in mind the circumstances that gave rise to the suspicion."). "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a de facto arrest that must be based on probable cause." United States v. Glover, 957 F.2d 1004, 1011 (2d Cir. 1992). "In determining whether an investigatory stop is sufficiently intrusive to ripen into a de facto arrest, the Second Circuit considers the 'amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.'" United States v. Vargas, 369 F.3d 98, 101 (2d Cir. 2004) (quoting United States v. Perea, 986 F.2d 633, 645 (2d Cir.1993)). The Court must also consider "the law enforcement purposes to be served by the stop [and] the time reasonably needed to effectuate those purposes" to determine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Sharpe, 470 U.S. at 686. "There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops." Alexander, 907 F.2d at 272. "Much as a 'bright line' rule would be desirable, in evaluating

10

whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." Sharpe, 470 U.S. at 685.

Under the facts presented here, the scope of the detention was reasonable and did not ripen into an arrest. The use of a reasonable amount of force, including the application of handcuffs, is permissible during an investigative stop if justified by the circumstances and necessary to ensure the safety of the detaining officers and bystanders. See Vargas, 369 F.3d at 102 ("[A]lthough '[u]nder ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop[,] intrusive and aggressive police conduct' is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.'") (internal quotation marks and alterations omitted). The officers' reasonable suspicion that plaintiff was Webb, a suspect in a violent crime, and plaintiff's flight into a third-party's residence justified the officers' application of handcuffs to perform a pat-down for weapons. Id. (holding that the officer's placing of plaintiff on the ground to handcuff him and conduct a pat down was reasonable in the circumstances of a Terry stop where the officers "had reliable information that [the suspect] was carrying a weapon[, and the suspect] had demonstrated his unwillingness to cooperate with the officers' investigation by fleeing from them when originally approached and continuing to struggle . . . following the stop"). Plaintiff's allegation that he was taken to the ground and briefly "choked" while he was being handcuffed, even if true, does not demonstrate that the detainment ripened into an arrest under these circumstances.

The placement of plaintiff in a police vehicle and his brief transport to police headquarters also does not transform the stop into an arrest. Although the movement of a suspect generally must be justified by the needs of the investigation, see Gilles v. Repicky, 511 F.3d 239, 245 (2d Cir. 2007) ("[A]n investigative detention must be temporary and last no longer than is

necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."), there is no per se rule that moving a suspect away from the scene indicates that the suspect was under arrest, see Glover, 957 F.2d at 1012 (declining to establish "a per se rule that moving from an airport, bus, or train terminal to a police office during a Terry-type encounter, for purposes of further investigation, automatically converts an otherwise permissible stop into an impermissible arrest upon arrival at the office" and instead applying a case-by-case approach); Dempsey v. Town of Brighton, 749 F. Supp. 1215, 1224-26 (W.D.N.Y. 1990) (holding that transportation of suspect to the crime scene for a show-up identification was reasonable under the circumstances of the Terry stop). Here, the movement of plaintiff was not so significant as to alter the nature of the detainment. Police headquarters was only one (1) mile from the Mann residence, the trip took only one (2) to two (2) minutes, and plaintiff's identification was verified shortly after the officers began to transport plaintiff. Hayes Affidavit [Docket Entry No. 23-5] ("Hayes Aff.") at ¶¶ 12-17. See Tehrani, 49 F.3d at 61 ("We decline to hold that a thirty minute detention based on reasonable suspicion is, per se, too long.") (collecting cases); Gil, 590 F. Supp.2d at 367-68 (holding that detention for not more than seventeen (17) minutes to allow for show-up identification did not exceed the scope of a permissible Terry stop). Cf., e.g., United States v. Smith, 549 F.3d 355, 360 (6th Cir. 2008) ("[H]andcuffing [the suspect] and transporting him to a police post, where he remained handcuffed for at least an hour and a half, rises to the level of arrest.").

Although the officers could have verified plaintiff's identification at the scene, they did so shortly after leaving and immediately after plaintiff indicated that he was not Webb. See Alexander, 907 F.2d at 273 ("The fact that an investigative stop might, in the abstract, have been

accomplished by some less intrusive means does not, in and of itself, render a stop unreasonable."). Moreover, the delay in verifying plaintiff's identification is largely attributable to plaintiff's flight from the officers. Had plaintiff not fled and responded to the officers' inquiries, the fact that the officers had mistaken him for his brother would have been revealed sooner. See Sharpe, 470 U.S. at 687 ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."); see also United States v. Brockington, 378 F. App'x 90, 92 (2d Cir. 2010) ("[The suspect's] resistance to the soft-hand technique, his non-compliance . . . , [and] his increasing agitation, . . . support the district court's characterization of the situation as 'escalating.' This escalation justified a longer detention, and, in light of [the officer's] 'fear for his safety,' more intrusive measures intended to reduce the risk of harm.").

It is also significant that plaintiff's detention was not prolonged for the purpose of conducting further investigation, but rather to ensure plaintiff was not injured. The officers immediately removed plaintiff's handcuffs upon arriving at police headquarters and escorted him inside in order to administer a physical condition questionnaire. According to Hayes, "[t]he purpose of the . . . questioning was to ascertain [plaintiff's] health, and need for medical attention (if any), in the wake of his apprehension," and "such questioning is standard police operating procedure in situations such as these." Hayes Aff. at ¶ 18. Plaintiff has not alleged that he was questioned about anything other than his physical condition. Cf. United States v. Felix, No. 08-CR-68A, 2009 WL 483178, at *9-10 (W.D.N.Y. Feb. 25, 2009) (holding that a Terry stop had escalated into an arrest where the suspect was driven by police officers to his house while the officers continued to question the suspect about the location of a gun). Defendants' decision to bring plaintiff into headquarters for several minutes in order to verify that plaintiff was not in

need of medical attention was not objectively unreasonable given that plaintiff had been chased and apprehended by officers.

As mentioned above, plaintiff's allegation that he was detained in police headquarters for one (1) to one and one half (1.5) hours is contradicted by video surveillance footage, and his attempt to dispute the accuracy of the video is without merit. Pl. 56.1 St. at ¶ 59. Sergeant Hayes verified that the video shows him arriving at police headquarters with plaintiff, Hayes Aff. at ¶¶ 16-24, and plaintiff is clearly visible leaving minutes later. Plaintiff's allegations that the handcuffs were not removed until after he was brought into police headquarters and that he was not wearing a gray hoodie at the time are also clearly contradicted by the video surveillance footage. In light of plaintiff's false allegations, his entire account of his treatment at the hands of the police officers lacks credibility, including his assertion that he signed the physical condition questionnaire against his will. See Jeffreys, 426 F.3d at 554 ("[W]here the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.") (quoting Anderson, 477 U.S. at 252).

3.    Qualified Immunity

To the extent that the officers did not have reasonable suspicion to stop plaintiff or exceeded the permissible scope of an investigative stop, they are nonetheless entitled to qualified immunity. "Qualified immunity 'shields police officers acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their actions violate clearly-established rights of which an objectively reasonable official would have known.'" Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005) (quoting Thomas v. Roach, 165 F.3d 137, 142 (2d

14

Cir.1999). Qualified immunity is "a shield from suit, not simply liability." Id. (citing Saucier v. Katz, 533 U.S. 194, 200 (2001)). A two-step analysis is applied to determine whether a suit against a police officer may proceed: "(1) the court must determine whether the facts, taken in the light most favorable to the party asserting an injury, show a violation of a constitutional right; and (2) the court must determine whether the constitutional right was 'clearly established' such that '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Saucier, 533 U.S. at 201–06) (alterations in original).

In a false arrest case, "an arresting officer will [] be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest," Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir.2004), or arguable reasonable suspicion to conduct an investigative stop, see Sutton v. Duguid, No. 05-CV-1215, 2007 WL 1456222, at *5-6 (E.D.N.Y. May 16, 2007); Gil, 590 F. Supp.2d at 370; Harris v. Wydra, No. 06-CV-352, 2008 WL 2079129, at *2 (D. Conn. May 15, 2008). "[T]o determine whether an officer is entitled to qualified immunity on an investigatory stop, the Court must examine whether (a) it was objectively reasonable for the officers to believe reasonable suspicion existed or (b) officers of reasonable competence could disagree on whether the reasonable suspicion test was met." Sutton, 2007 WL 1456222, at *6. According to the Second Circuit, "[i]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." Cerrone v. Brown, 246 F.3d 194, 202-03 (2d Cir. 2001) (internal quotation marks and citations omitted).

Even if defendants lacked reasonable suspicion to stop plaintiff or exceeded the permissible scope of an investigative stop by driving plaintiff to police headquarters and administering a physical condition questionnaire, a jury could not conclude that "no officer of reasonable competence could have made the same choice[s] in similar circumstances," Lennon, 66 F.3d at 420-21. It was objectively reasonable for the officers to believe that they had reasonable suspicion to stop plaintiff in light of plaintiff's resemblance to Webb and his flight from the officers. Given the reasonableness of the initial stop, it was also not unreasonable for the officers to believe that they were acting properly in questioning plaintiff to determine whether he needed medical attention. See DiStiso v. Cook, 691 F.3d 226, 240 (2d Cir. 2012) ("Qualified immunity thus affords government officials breathing room to make reasonable— even if sometimes mistaken—decisions, and protects all but the plainly incompetent or those who knowingly violate the law from liability for damages.") (internal quotation marks and citations omitted).

For the foregoing reasons, the investigatory stop of plaintiff was justified at its inception and was reasonably related in scope to the circumstances which justified the interference, and therefore did not ripen into a de facto arrest. To the extent that the officers lacked reasonable suspicion or exceeded the permissible scope of an investigative stop, they are protected by qualified immunity. Accordingly, defendants are granted summary judgment with respect to plaintiff's false arrest claim.[5]

C.    Excessive Force

The following analysis is applied to assertions of qualified immunity against claims of excessive force:

---

[5]    Given the determination that plaintiff's detention did not ripen into an arrest, it is not necessary to consider whether the officers had arguable probable cause to arrest plaintiff.

The threshold question is whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation. The inquiry is whether the alleged use of excessive force was objectively reasonable. Thus, claims that an officer made a reasonable mistake of fact that justified the use of force are considered at this stage of the analysis. If the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover. If, however, a constitutional violation can be shown, the court must then determine whether the constitutional right was clearly established at the time of the constitutional violation. This inquiry focuses on whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . This inquiry adds a 'further dimension' to the qualified immunity analysis by acknowledging that reasonable mistakes can be made as to the legal constraints on particular police conduct. And it ensures that all but the plainly incompetent or those who knowingly violate the law are protected from suit.

Cowan v. Breen, 352 F.3d 756, 761 (2d Cir. 2003) (internal quotation marks and citations omitted).

To establish a constitutional violation, plaintiff must show that Detective Bulik's and Officer Azueta's use of force was "'objectively unreasonable in light of the facts and circumstances confronting [them], without regard to [their] underlying intent or motivation.'" Nimely v. City of N.Y., 414 F.3d 381, 390 (2d Cir. 2005) (quoting Maxwell v. City of N.Y., 380 F.3d 106, 108 (2d Cir. 2004)). In determining the reasonableness of the use of force, the Court must consider the "totality of the circumstances faced by the officer on the scene," Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995), including: "(1) the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] [was] actively resisting arrest or attempting to evade arrest by flight," Graham, 490 U.S. 386, 396 (1989). Additionally, plaintiff "must establish through evidence, that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable'" and that "'the amount of force used was more than de minim[i]s.'" Phelps v. Szubinski, 577 F. Supp.2d 650, 661 (E.D.N.Y. Sep. 23 2008) (quoting Rincon v. City of N.Y., No. 03-CV-3276, 2005 WL 646080, at *4 (S.D.N.Y. Mar. 21, 2005)); see also Romano v. Howarth, 998 F.2d 101,

105 (2d Cir. 1993) ("[A] de minimis use of force will rarely suffice to state a constitutional claim.").

Plaintiff alleges that he was "slammed" to the floor, placed in handcuffs, then "choked" for three (3) seconds. Even if true, such a use of force would not be unreasonable under these circumstances. "A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists." Alexander, 907 F.2d at 272. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27.

As discussed above, the officers reasonably suspected at the time that plaintiff had committed an armed robbery, and plaintiff fled into a residence that officers knew belonged to a third-party.[6] See Def. 56.1 St. at ¶ 23. Under such circumstances, the decision to take plaintiff to the ground and apply handcuffs is not unreasonable. See Hodge v. City of Long Beach, 425 F. App'x 33, 34-35 (2d Cir. 2011) (holding that officers were protected by qualified immunity where the plaintiff was suspected of domestic violence, refused to remove his hands from his pockets and walked away from the officers, and the officers "spun [the suspect] around with a forearm, grabbed his neck, put him in a bear hug, and pulled his arms behind his back as they attempted to handcuff him, causing injuries and bruises to his back, and abrasion on his arms and neck, and rendering him unable to swallow").

---

6       According to plaintiff, "Ms. Mann is a relative [of plaintiff] who took care of [him] from childhood and who [he] refers to as his grandmother and whom [he] visits everyday." Pl. Memo. at 7. The issue is irrelevant, since at the time that plaintiff fled into Ms. Mann's house, the officers thought plaintiff was Webb.

18

Moreover, plaintiff's allegations fail to show more than a de minimis use of force. Although plaintiff alleges that he has suffered serious back pain as a result of being "slammed" to the ground by Detective Bulik, he did not seek medical treatment for his alleged back injury for two (2) days after the incident (because he was "mad and stressed out," Pl. 56.1 St. at ¶ 106), and fails to allege that he suffered any injury from being "choked." Medical records subpoenaed by defendants from Mercy Medical Center indicate that plaintiff rated his back pain a four (4) on a scale of ten (10) on November 6, 2010 and was diagnosed with "muscle strain" and "back strain." Declaration of Robert M. Agostisi, Ex. K. Plaintiff asserts that he has continued to suffer from back pain and has required ongoing therapy. However, considering the circumstances in which the alleged use of force occurred and the fact that the use of some amount of force was not gratuitous or unreasonable, these alleged injuries are not sufficiently serious to constitute a constitutional deprivation. Cf. Harwe v. Floyd, No. 09-CV-1027, 2011 WL 674024, at *15 (D. Conn. Feb. 17, 2011) ("If a jury found that [the suspect] was fully compliant [during the Terry stop], it might find that even a very minimal use of force against [the suspect] would have been unreasonable."); Lemmo v. McKoy, No. 08-CV-4264, 2011 WL 843974, at *7 (E.D.N.Y. Mar. 8, 2011) (denying summary judgment where plaintiff's injuries were de minimis but "the cranking of [the plaintiff's] thumbs by police officers was entirely gratuitous"). See also, e.g., Rincon v. City of N.Y., No. 03-CV-8276, 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) (holding that use of force was de minimis where the plaintiff was subject to a valid arrest and alleged that she was thrown to the ground and handcuffed and received medical treatment for swelling in her leg and wrist); Felder v. Diebel, No. 10-CV-343, 2012 WL 6690239, at *5 (W.D.N.Y. Dec. 21, 2012) (holding that use of force was de minimis where the plaintiff alleged that the defendant "slapped [him] twice and choked him," but "there

[was] no indication that [the plaintiff] sought medical treatment until two days later," and his medical records "indicate[d] no signs of injuries consistent with his allegations and no medical treatment").

To the extent that the force used was excessive, it would not be "clear to a reasonable officer that [the] conduct was unlawful" given the rapidly developing situation and the indications of potential danger to the officers and bystanders. Graham, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."); Hodge, 425 F. App'x at 35 ("[B]ecause of the plaintiff's defiance and the indicia of a potential incident of domestic violence, it would not be 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (quoting Saucier, 553 U.S. at 202). Viewing the allegations in the light most favorable to plaintiff, the officers are entitled to qualified immunity as "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." Lennon, 66 F.3d at 426.

Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's excessive force claim.

D.     Equal Protection

"To establish an Equal Protection violation, a plaintiff must prove purposeful discrimination directed at an identifiable or suspect class." Quinn v. Nassau Cnty. Police Dep't, 53 F. Supp.2d 347, 355 (E.D.N.Y. 1999) (citing Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995)). "[A]n Equal Protection violation based upon selective application of a facially lawful state regulation is properly found when: (1) the person, compared with others similarly situated,

20

was selectively treated; and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." Id. As discussed above, the facts alleged do not support the assertion that defendants discriminated against plaintiff upon the basis of his race. Plaintiff also appears to have abandoned this claim, as he failed to respond to defendants' argument for dismissal. Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's equal protection claim.

E.    Monell Liability

In light of the absence of an underlying constitutional violation, plaintiff cannot sustain a claim for municipal liability. MacFall v. City of Rochester, No. 10-CV-4638, 2012 WL 3871414, at *2 (2d Cir. Sep. 7, 2012) ("Given that plaintiffs failed to adequately allege an underlying constitutional violation, the district court did not err in dismissing their claim for municipal liability."); Martinez, 340 F. App'x at 702 ("Because the arresting officers in this case did not violate plaintiff's constitutional rights, there can be no municipal liability even if plaintiff had alleged a specific policy or custom that led to his detainment."); Lamothe v. Town of Oyster Bay, No. 08-CV-2078, 2012 WL 6720781 (E.D.N.Y. Dec. 27, 2012) ("If there is no underlying constitutional violation, then the Plaintiffs' claims for municipal liability . . . must ultimately fail.").

Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's municipal liability claim.

F.     State Claims

"A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006). In deciding whether to exercise supplemental jurisdiction, a district court must "balance[] the traditional 'values of judicial economy, convenience, fairness, and comity.'" Id. (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Id. (quoting Cohill, 484 U.S. at 350 n.7).

Given that all of plaintiff's federal law claims are dismissed, the Court declines to exercise supplemental jurisdiction over plaintiff's pendent state-law claims. Accordingly, plaintiff's claims for battery, negligence and intentional infliction of emotional distress are dismissed without prejudice.

IV.     Conclusion

For the foregoing reasons, defendants motion for summary judgment [Docket Entry No. 23] is granted. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: February /5, 2013
       Central Islip, New York