UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------------x
JESSE B. PARKER,

        Plaintiff,

   -against-

MICHAEL BULIK, BRUCE AZUETA, and CITY OF
LONG BEACH,

        Defendants.
----------------------------------------------------------------------------x

**Memorandum of
Decision & Order**
11-cv-5412(ADS)(SIL)

<u>APPEARANCES:</u>

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiff*
556 Peninsula Boulevard
Hempstead, NY 11550
      By:   Frederick K. Brewington, Esq., Of Counsel

**Office of the Corporation Counsel
   for the City of Long Beach**
*Attorneys for the Defendants*
1 West Chester Street
Long Beach, NY 11561
      By:   Robert M. Agostisi, Corporation Counsel
             Richard Berrios, Assistant Corporation Counsel

**SPATT, District Judge:**

     On November 18, 2016, following a weeklong trial, a jury returned a defense verdict as to the

claims of Plaintiff Jesse Parker ("Parker" or the "Plaintiff") for false arrest under 42 U.S.C. § 1983 and

New York battery. Parker now seeks an order vacating the jury's verdict and entering judgment in

his favor under Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 50, or, alternatively, a new trial

under Rule 59.

     For the reasons that follow, those motions are denied.

## I. Procedural Background

On November 4, 2011, the Plaintiff commenced this action against the City of Long Beach and several individual police officers whose identities were then unknown to the Plaintiff. The case was originally assigned to United States District Judge Sandra J. Feuerstein.

In general, the original complaint alleged that, on November 4, 2010, mistaking his identity for that of his brother – a wanted man – the Long Beach Police Department unlawfully arrested and subjected the Plaintiff to excessive force. He alleged federal claims based on § 1983 false arrest; § 1983 false imprisonment; § 1983 excessive force; and § 1983 municipal liability under *Monell*. He also alleged pendent state law claims sounding in negligence; battery; and intentional infliction of emotional distress.

On January 3, 2012, the Defendants filed an answer substantially denying the Plaintiff's allegations of wrongdoing.

After initial discovery, on September 5, 2012, the Plaintiff filed an amended complaint. Subsequently, on September 18, 2012, he filed a second amended complaint. In relevant part, these filings identified the individual John Doe Defendants as Detective Lieutenant James Canner; Detective Michael Bulik; Sergeant Karl Hayes; and Police Officer Bruce Azueta. Otherwise, the amended complaints set forth substantially the same material facts and theories of liability as the original pleading.

On September 19, 2012, the Defendants moved under FED. R. CIV. P. 56 for summary judgment dismissing the second amended complaint.

By Memorandum and Order dated February 15, 2013, Judge Feuerstein granted that motion, dismissing the federal causes of action over which the court had original jurisdiction and declining to exercise supplemental jurisdiction over Parker's pendent state law claims.

However, in a Summary Order issued on April 15, 2014, the Second Circuit partially vacated that decision and remanded the case for additional proceedings. Namely, the Court of Appeals

determined that, contrary to the district court's findings, triable issues of fact existed with respect to whether, on the date in question, Detective Bulik and Officer Azueta had probable cause to arrest the Plaintiff. Thus, the court reinstated the Plaintiff's claim based on § 1983 false arrest as against those individual Defendants.

On September 23, 2014, in light of the Second Circuit's decision, and upon the Plaintiff's motion, Judge Feuerstein also reinstated the pendent state law claims against those two Defendants, which had previously been dismissed without prejudice.

On May 19, 2015, the Defendants filed a second motion for summary judgment, this time specifically seeking to dismiss any potential state law claims against Bulik and Azueta.

By Order dated March 21, 2016, Judge Feuerstein partially granted that motion and dismissed the claims for negligence and intentional infliction of emotional distress. However, the court denied summary judgment as to the Plaintiff's cause of action based on New York battery.

Therefore, the only claims remaining for trial included § 1983 false arrest and common law battery against Detective Bulik and Officer Azueta.

On April 6, 2016, Judge Feuerstein recused herself from this case, and on April 8, 2016, the matter was reassigned to this Court for trial.

In a November 7, 2016 pretrial ruling, the Court reinstated the City of Long Beach as a Defendant, finding that the City may potentially be vicariously liable for the torts of its employees. Otherwise, the parties' motions *in limine* were denied; a jury was selected on November 7, 2016; and the trial commenced on November 8, 2016.

## II.     The Evidence Adduced at the Trial

In discussing the evidence adduced at the trial, references to the trial transcript are denoted as "Tr." The facts are presented here in the light most favorable to the Defendants.

At approximately 3:40 P.M. on November 4, 2010, Detective Lieutenant James Canner of the Long Beach Police Department was traveling in an unmarked police vehicle northbound on

Riverside Boulevard in the "North Park" section of Long Beach. (Tr. 60, 871) The North Park community is populated largely by African-American and Hispanic residents. (Tr. 53, 511-12)

Earlier in his career, Canner had spent seven years as a patrolman in the North Park community. (Tr. 52, 54-55, 873) Throughout that time, he became familiar with the neighborhood and came to know certain of its residents, including one Antonio Webb, with whom he was generally familiar. (Tr. 56, 874) On the date in question, he knew that Webb was wanted by the Long Beach Police Department, specifically an investigating detective named Roarke, in connection with an armed robbery that occurred several days earlier. (Tr. 114, 122)

As he proceeded along Riverside Boulevard, Canner observed an individual walking on the opposite side of the street, also moving in a northerly direction, wearing a gray hooded sweatshirt, with the hood pulled over his head, and jeans. (Tr. 63, 874) He believed this individual to be Webb. (Tr. 60, 115, 873-74)

Although Canner knew that Webb stood about six feet tall (Tr. 58, 908), he did not carefully assess this individual's height or weight. Rather, he performed a "quick [visual] overview" from his moving vehicle and concluded that the individual was, in fact, Webb. (Tr. 66-67, 115, 874-75, 915) In this regard, Canner claimed to have gotten a good look at the individual's face, which he learned in the police academy is the most reliable element in identifying a suspect because it is the least likely to change over time. (Tr. 874-75, 870) He also examined the individual's complexion and thin build, and concluded that the individual looked "exactly like" Antonio Webb. (Tr. 880-81, 915)

As it turned out, the individual observed by Canner was the Plaintiff Jesse Parker, Webb's biological brother, with whom Canner had also become generally familiar from his time as a Long Beach police officer. (Tr. 64-65, 908) Physically, Canner could tell the brothers apart and knew, for example, that Parker was shorter than Webb. (Tr. 75, 908). In fact, although five years Webb's senior, police records indicate that Parker is approximately seven inches shorter and 20 pounds lighter than Webb.

Nevertheless, Canner testified that these events unfolded quickly, and he believed Webb to be dangerous. (Tr. 874-75) Therefore, based on his observations of the individual with the gray hooded sweatshirt, Canner sent out a radio transmission requesting that police personnel respond to the location in order to confirm Webb's identity and arrest him. (Tr. 69, 898) To that end, Canner provided the individual's location; his direction of travel; and a physical description, namely, a black male wearing a gray hooded sweatshirt and pants. (Tr. 70, 80-81).

He did not, however, identify Webb by name. Evidently, it is standard police practice to omit suspects' names when communicating over the radio because such transmissions can easily be intercepted, thus providing forewarning to individuals sought by police and placing the responding officers in danger. (Tr. 68-69, 114, 881-82) Instead, Canner identified Webb by reference to Detective Roarke's investigation. (Tr. 122, 881, 887, 1003)

The road on which Canner and his suspect were traveling, namely, Riverside Boulevard, terminates at its intersection with East Pine Street. When approaching in a northerly direction, East Pine Street permits only one-way eastbound vehicular traffic. (Tr. 82-83) Thus, when he reached this intersection, Canner was forced to make a right-hand turn with the flow of traffic. (Tr. 82)

However, since he was on foot, the hooded individual turned left onto East Pine Street, where Canner observed him convene with two other individuals, both African-American males appearing to be in their 20s, in the vicinity of an apartment building located on the 90-99 block of East Pine Street. (Tr. 85-86, 203) He sent out another radio transmission with this information. (Tr. 85-86, 883, 892)

Detective Bulik and Officer Azueta were traveling in an unmarked grey police SUV approximately half a mile from Canner's location when they received his radio transmissions. (Tr. 122, 953, 957, 1004) Bulik was driving and Azueta rode in the front passenger seat. (Tr. 129)

Even without hearing Webb's name, Bulik understood that Canner's reference to Det. Roarke's investigation meant that the individual he was describing was Webb. (Tr. 956) Throughout his career as a member of the Long Beach Police Department, Bulik had several interactions with Webb and spoke with him occasionally about neighborhood disturbances and other matters. (Tr. 201, 956-57) Although he did not know Webb's exact height and weight, he was generally familiar with his appearance and, standing 5' 7" himself, believed Webb to be taller than he was. (Tr. 201)

Bulik was also familiar with Jesse Parker and could generally tell the brothers apart. (Tr. 202, 958-59) For example, he knew that Parker was shorter than Webb; about 20 pounds lighter; and had a lighter complexion. (Tr. 205-06) However, he believed that the brothers shared distinctive facial features. (Tr. 999)

On the date in question, Bulik's regular partner, Detective Walter Munsterman, was unavailable, so Bulik was partnered with Police Officer Bruce Azueta. (Tr. 198-99, 954) Azueta, who was otherwise a patrolman for his entire career, had been temporarily assigned to the Detective Division for the month of November 2010. (Tr. 118, 1000)

Since Azueta was only four days into this temporary assignment with the Detective Division, he was not familiar with Det. Roarke's robbery investigation and thus did not immediately understand Canner's reference. (Tr. 123-24) However, upon receiving the radio transmission, Bulik advised Azueta that the individual to whom Canner had referred was Antonio Webb. (Tr. 123-24, 127) Bulik did not provide Azueta with a physical description of Webb (Tr. 128, 192), and, despite having knowledge of an individual by that name, and previously viewing a police photograph of him, Azueta was otherwise unfamiliar with Webb's appearance. (Tr. 124-25, 1005-06)

At approximately 3:45 P.M. (Tr. 170-71), the two men – Bulik in plainclothes and Azueta in a business suit (Tr. 134, 202, 954, 1002-03) – responded to the scene. (Tr. 129, 957-58)

To avoid the traffic situation experienced by Canner, Bulik and Azueta took an indirect route, proceeding east on Park Avenue; making a left onto Riverside Boulevard heading north; making another left on East Market Street and proceeding to the Rev. JJ Evans Boulevard (also known as Park Place); and then making a right heading east on East Pine Street. (Tr. 960, 1005) This evidently allowed them to approach the scene while moving with the flow of one-way traffic.

When they arrived, they observed three African-American males in street clothes, all of whom appeared to be about the same height, weight, and build, in the general vicinity of the address provided by Det. Canner. (Tr. 130, 204-05, 961, 1006) Bulik did not make a specific assessment that any of the men was a particular height or weight, or that any had a particular complexion. (Tr. 218)

Nevertheless, based on his prior knowledge and experience, as well as Canner's description, Bulik identified the individual wearing the gray hooded sweatshirt as Webb. (Tr. 186, 204-05, 217-18, 962) Apparently unable to identify Webb himself, and based on Bulik's supposed familiarity with that individual, Azueta relied on Bulik's identification. (Tr. 185-86, 1006-07)

They stopped the police vehicle along the curb approximately ten feet from where the group was standing. (Tr. 209-13)

Immediately, one of the men walked away, leaving two individuals who, in actuality, were Parker and Anthony Rodgers – a close friend of Parker's, who is commonly referred to by friends and family as "Ant." (Tr. 707)

The officers exited their vehicle. As Bulik did so, he removed the badge he wore around his neck from underneath his shirt so that it was visible. (Tr. 210, 963, 954) Azueta wore his badge on his right hip, clipped to his belt. (Tr. 181, 954-55, 1002) Without verbally identifying themselves as police, and believing that the man in the grey hooded sweatshirt was Antonio Webb, Azueta stated, "Hey, Tony, come here." (Tr. 132-33, 211, 963, 1007)

Although it is not clear which of the two men did so, someone responded, "What for?" (Tr. 133, 963, 1007) Azueta believed that the person responding to "Tony" was Antonio Webb

(Tr. 134), a suspicion that was apparently confirmed when both men took off running toward an apartment located at 93A East Pine Street. (Tr. 135, 964, 1008)

The officers gave chase (Tr. 212), shouting "Police, Stop," (Tr. 135-36, 971), and Bulik sent out a radio transmission indicating that he and Azueta were in a foot pursuit. (Tr. 246, 884, 971, 1009)

The fleeing men entered apartment 93A and locked the door behind them. (Tr. 137, 220, 1008) Bulik knew that Webb did not live at that address, and knew that an elderly resident named Mary Mann did. (Tr. 221, 961, 967-68, 972) Indeed, he had patrolled that neighborhood his entire career and had observed Ms. Mann at that address hundreds of times. (Tr. 967-68)

Thus, believing Webb to be dangerous and fearing for Ms. Mann's safety (Tr. 972), the officers initially attempted to use force to open the door. (Tr. 138-39, 149, 972, 1108-09) However, Ms. Mann eventually opened the door from inside, permitting the officers to enter. (Tr. 141, 228, 972, 1008-09) Upon entering the residence, they immediately observed the individual they believed to be Webb standing in the kitchen, which, due to the presence of sharp objects customarily in that room, posed a perceived danger to the officers' safety, even in the absence of any overt threats by the suspect. (Tr. 142, 148, 231, 253, 972-74, 1010-11)

At this point, Ms. Mann shouted "Ant, stop. Ant, stop," which again led the officers to believe that the person they were encountering was Antonio Webb. (Tr. 143, 975, 1011)

Without drawing their firearms, the officers directed the individual to place his hands on the counter, which he did, and placed him in handcuffs. (Tr. 149, 231-32, 234, 976, 1011-12)

The man they arrested was Jesse Parker, who claims that he was slammed to the floor by Detective Bulik and choked by Officer Azueta during this encounter. (Tr. 303-05) Bulik and Azueta deny that he was subjected to any force during the arrest (Tr. 151-52, 976-77, 1012) and Ms. Mann claimed not to have observed any of the alleged force described by Parker. (Tr. 281)

In any event, once in handcuffs, Parker was escorted out of Ms. Mann's home and placed into an unmarked police vehicle that Sergeant Richard DiPalma and Detective Sergeant Karl Hayes had used to respond to the scene. (Tr. 153, 239, 978, 1013)

A total of approximately 45 seconds elapsed between Canner's initial radio transmission identifying the suspect as Antonio Webb and the time Parker was in custody. (Tr. 885, 891-92)

Azueta placed Parker in the rear driver-side seat of the vehicle, and then positioned himself in the rear passenger-side seat. (Tr. 153) At the time they entered the vehicle, DiPalma was still sitting in the driver's seat, and the front passenger seat was empty. (Tr. 552, 925, 1013)

Eventually, Det. Sgt. Hayes, the commanding officer of the Long Beach Detective Division (Tr. 50, 866, 870), entered the vehicle in the front passenger seat, and Sgt. DiPalma began to drive. (Tr. 154, 517, 925, 1014) When he did so, the arrestee stated, "What did I do," or words to that effect (Tr. 522, 925, 1014). Hayes responded, "We'll tell you later, Tony," or words to that effect. (Tr. 154-55, 522, 926, 1014) At that point the arrestee stated, "I'm not Tony," prompting Hayes to turn around, view the individual, and realize it was not Antonio Webb. (Tr. 154-5, 523, 926, 1014)

At Hayes' direction, Azueta reached into Parker's left back pants pocket and removed a wallet, which contained documentation positively identifying him. (Tr. 155-57, 309, 443, 1014)

By this time, the vehicle was en route to the precinct, and Hayes decided to transport Parker the half-mile to the station house, rather than stop along East Pine Street and release him. (Tr. 157, 311, 527-28, 553, 554, 926) At Hayes' direction, DiPalma pulled up to the building's public entrance, as opposed to the side entrance designated for prisoners. (Tr.525, 926-27, 1017)

Upon exiting, the handcuffs were immediately removed from Parker's wrists (Tr. 529) and Hayes asked Parker if he would come inside and complete a Form 79 indicating whether he had been injured or was in need of medical attention. (Tr. 162, 186, 530, 547, 927)

When he agreed, Azueta, Hayes, and DiPalma led Parker to a so-called DWI room, which is sometimes used to process arrestees and confine people who are in custody on suspicion of drunken

driving (Tr. 160-61), but is also used for varied other purposes, including interviews, meetings, meal breaks, and storage. (Tr. 183, 536)

Pursuant to the Long Beach Police Department's usual practice, Hayes asked Parker the questions contained on the Form 79; manually recorded Parker's answers; and then asked him to review it for accuracy and sign it. (Tr. 351, 548, 550, 561-62) Also pursuant to usual practice, if Parker had refused to sign the document, he could have written "*refused*" on the signature line – either way, Parker would have been free to go. (Tr. 549, 561-62, 896)

However, Parker voluntarily signed the form, indicating that he had no injuries or need for medical attention, and left the precinct. (Tr. 313, 316, 551) Surveillance footage shows that Parker was inside the precinct for approximately five minutes. (Tr. 934-39)

Asked whether, on these facts, the Defendants proved that they had reason to believe in good faith that the person they were arresting was Antonio Webb, the jury answered affirmatively. (Tr. 1392) Asked further whether, on these facts, the Plaintiff proved that that either of the Defendants committed a battery against him, the jury answered negatively. (Tr. 1393)

These motions followed.

### III.    The Rule 50 Motion for Judgment as a Matter of Law

A.    **The Standard of Review**

Rule 50 "allows for the entry of judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis." *Pouliot v. Paul Arpin Van Lines*, 235 F.R.D. 537, 541 (D. Conn. 2006); *see* FED. R. CIV. P. 50(a)(1) (authorizing judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue").

However, this standard "generally imposes a heavy burden" on the movant, *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), and "[a] district court should not grant judgment as a matter of

law unless the evidence, viewed in the light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to find in his favor," *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007). "Th[e] burden is 'particularly heavy' where, as here, 'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant." *Cash*, 654 F.3d at 333 (quoting *Cross v. N.Y.C. Tr. Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)).

In evaluating such a motion, the Court's role is not to make its own credibility determinations or to weigh the evidence adduced at the trial. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998); *Mattivi v. S. African Marine Corp.*, "*Huguenot*", 618 F.2d 163, 167 (2d Cir. 1980) (instructing that the "trial court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury").

"Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment [as a matter of law] only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." *Id.* at 168.

Stated otherwise, the present motion may only be granted if, after making all credibility assessments against the Plaintiff and drawing all inferences against him, any reasonable juror would nevertheless have been *compelled* to accept his view. *See Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993); *see also Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970) (stating the relevant standard as "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached").

## B. The Applicable Legal Principles

The legal question at the heart of this case is whether the evidence adduced at the trial was sufficient to permit a reasonable juror to conclude that Detective Bulik and Officer Azueta had probable cause to arrest the Plaintiff. This is because the existence of probable cause is a complete defense to a claim of false arrest under § 1983. *See Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Further, as to his claim for New York battery, the Plaintiff's only argument favoring judgment as a matter of law is that an officer's use of force is necessarily excessive when there is no probable cause for the underlying arrest. *See* Pl. Memo of Law at 11.

Thus, if the jury's probable cause determination was amply supported by the evidence in the record, the Plaintiff's current motion will be denied.

As a general proposition, "[p]robable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007). This inquiry is an objective one, and turns on "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)); *O'Neill v. Babylon*, 986 F.2d 646, 650 (2d Cir. 1993) (noting that, in evaluating whether probable cause existed, courts "look only at the information the arresting officer had at the time of the arrest").

The Court recognizes that "[t]he risk of misidentification based on coincidental circumstances is unquestionably substantial and presents a difficult balance between the necessity of apprehending the guilty and the necessity of protecting from incarceration the innocent." *Francois v. United States*, 528 F. Supp. 533, 535 (E.D.N.Y. 1981). However, it is well-settled that "a mistaken

identity can provide the basis for probable cause," so long as "the police ha[d] probable cause to arrest the person sought and the arresting officer reasonably believed that the arrestee was that person." *Martinez v. Muentes*, 340 F. App'x 700, 701 (2d Cir. 2009) (Summary Order); *Gonzalez v. City of New York*, No. 98-cv-6081, 2002 U.S. Dist. LEXIS 2749, at *16-*17 (S.D.N.Y. Feb. 20, 2002), *aff'd*, 69 F. App'x 7 (2d Cir. 2003) (Summary Order).

The Supreme Court's decision in *Hill v. California*, 401 U.S. 797, 802, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971), clarifies the standard in mistaken arrest cases: "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *See also United States v. Rosario*, 543 F.2d 6, 9 (2d Cir. 1976) (Meskill, J., dissenting) ("Analysis of mistaken identity cases under *Hill v. California* [ ] is a two-step process. The first step is to determine whether there was probable cause to arrest the right person, and the second step is to determine whether the arrest of the wrong person was a 'reasonable,' 'understandable,' or 'good faith' mistake" (quoting *Hill*, 401 U.S. at 802-04)).

Thus, in this case, the operative underlying question was not necessarily whether the Long Beach police had probable cause to believe that Jesse Parker committed a crime; it was whether they had probable cause to believe that Antonio Webb committed a crime, and if so, whether the facts and circumstances known to Detective Bulik and Officer Azueta at the time of the arrest made it reasonable to mistake Jesse Parker for Antonio Webb.

Indeed, once probable cause exists to arrest a person sought by police, the pivotal question in mistaken arrest cases is "whether, given all the circumstances surrounding the arrest, the actions of the arresting officers [in mistaking the arrestee for the wanted suspect] were reasonable." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986) (noting that the reasonableness of an officer's conduct is determined "by considering the totality of the objective circumstances surrounding the arrest"), *cert. denied*, 479 U.S. 1067, 107 S. Ct. 957, 93 L. Ed. 2d 1005 (1987); *United States v. Viscioso*, 711 F. Supp. 740,

746 n.2. (S.D.N.Y. 1989) (having "concluded that the police had probable cause to make the arrests of the persons sought, [ ] the only remaining question is whether the police could reasonably believe that [the arrestees] were the persons sought").

"The rationale for th[is] rule is clear: the deterrence function of the fourth amendment . . . is not served by invalidating a mistaken arrest . . . where the police acted in good faith and in a reasonable manner." *Valez*, 796 F.2d at 27.

In such cases, that further investigation by the officers may ultimately reveal the arrestee to be someone other than the person sought "does not in any way render the arrest unconstitutional." *Vasquez v. McPherson*, 285 F. Supp. 2d 334, 341 (S.D.N.Y. 2003).

Rather, it is "sufficient probability, not certainty, [that] is the touchstone of reasonableness under the Fourth Amendment," and liability for false arrest will not lie where the record permits a reasonable inference that "the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Hill*, 401 U.S. at 804; *Gonzalez*, 2002 U.S. Dist. LEXIS 2749, at *17 ("Probable cause 'is a fluid concept – turning on the assessment of probabilities in particular factual contexts' ") (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S. Ct. 1535, 76 L. Ed. 2d 502 (1983)).

With these principles in mind, the Court turns to the parties' substantive contentions.

C.      **Application to the Facts of this Case**

Applying the standards outlined above, the question for the jury was whether the facts and circumstances known to Detective Bulik and Officer Azueta at the time of the arrest, and of which they had reasonable and trustworthy information, were sufficient to justify a prudent person in concluding that Jesse Parker was Antonio Webb, whom the police believed they had probable cause to arrest for armed robbery. *See Hill*, 401 U.S. at 802; *Valez*, 796 F.2d at 26; *see also* Tr. 1343 (charging the jury).

The jury answered this question in the affirmative.

Thus, the question now becomes whether the trial record was so completely lacking in evidence to support this determination that the verdict could only have been the result of sheer surmise and conjecture. Or, stated differently, whether there was such overwhelming evidence that Detective Bulik and Officer Azueta acted unreasonably that no reasonable and fair-minded person could arrive at a verdict in their favor.

In the Court's view, considering the entire record in the light most favorable to the Defendants, there was ample evidence to support the jury's conclusion that Bulik and Azueta acted reasonably in mistaking the Plaintiff for his brother.

Simply stated, all objective signs pointed to the conclusion that the Defendants had positively identified and were in pursuit of Antonio Webb. In this regard, the ranking officer in the Detective Division made a tentative identification of a suspect he believed from personal experience to be Webb. When Bulik and Azueta responded to the scene, one of the men they approached responded to the name "Tony" and fled into a nearby apartment where Det. Bulik knew he did not live. When they entered, the police again heard the apartment's homeowner shouting at someone named "Ant." In the Court's view, these circumstances were sufficient to warrant an ordinarily prudent police officer in the belief that the suspect in question was Antonio Webb.

That Canner's initial description of this individual – namely, a black male in a grey hooded sweatshirt and pants – is not a model of specificity does not render the arrest unconstitutional. Rather, in the Court's view, the jury could have found that the totality of facts and circumstances known to the arresting officers, including the dangerous propensities of Webb, justified their actions.

This remains true despite the Plaintiff's emphasis on certain physical disparities between Parker and Webb on the date in question, namely, Webb was seven inches taller and approximately

20 pounds heavier than Parker; Webb's skin color was lighter in complexion than Parker's; and Webb wore a short, cropped haircut, while Parker wore "corn rows."

Especially when examined in the comfort of a courtroom six years after the incident, it is clear to see that the brothers bear some dissimilar traits. However, the Court finds that the Plaintiff's near-singular reliance on physical disparities between the brothers is misplaced, as it apparently ignores other critical facts regarding the events that unfolded on the date in question.

This includes the Plaintiff's decision to flee the police immediately upon their approach. *See, e.g.*, *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007) (noting that "[a] person's flight from police . . . and the fact that he matches even a vague description provided by a witness[ ] are certainly factors to be considered in evaluating probable cause"); *People v. Kelland*, 171 A.D.2d 885, 567 N.Y.S.2d 810 (2d Dep't 1991) (noting that, although "evidence of flight alone is [ ] insufficient to justify an arrest," "when combined with other indicia of criminal activity, evidence of flight weighs heavily in determining whether probable cause exists to make an arrest"), *lv. denied*, 567 N.Y.2d 997, 571 N.Y.S.2d 922, 575 N.E.2d 408 (1991); *accord Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) ("Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"); *United States v. Harley*, 682 F.2d 398, 401 (2d Cir. 1982) ("From the very infancy of criminal law, juries have been permitted to consider flight as evidence of consciousness of guilt and thus of guilt itself") (internal quotation marks and citation omitted); *Bradley v. Village of Greenwood Lake*, 376 F. Supp. 2d 528, 534 (S.D.N.Y. 2005) ("Deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of an officer relating the suspect to the evidence of a crime, they are proper factors to be considered in the decision to make an arrest") (quoting *Sibron v. State of New York*, 392 U.S. 40, 66-67, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968)).

It also includes the somewhat unfortunate coincidence that the Plaintiff's associate was named Anthony, which, when abbreviated to "Ant" or "Tony," is reasonably susceptible to confusion with the name Antonio. *See, e.g., Martinez,* 340 F. App'x at 701-02 (finding probable cause to arrest where, despite known discrepancies in skin tone, height, and weight, the arrestee went by the same name as the wanted suspect); *United States v. Acosta,* No. 12-cr-224, 2013 U.S. Dist. LEXIS 65072, at *22-*23 (S.D.N.Y. May 6, 2013) (finding probable cause where an officer, with reason to believe that a suspect was nearby, called out "Paco" to a group of men, one of whom fit the suspect's description and responded to that name); *Johnson v. City of New York,* 940 F. Supp. 631, 636 (S.D.N.Y. 1996) (finding an issue of fact regarding probable cause where, despite a four-inch height difference, a 20-25 pound weight difference, and differing skin tones, hair colors, and eye colors, the officers arrested someone with same name, "Steven Johnson," as a wanted suspect).

Viewing the record in the Defendants' favor, the Court can see how these facts might have overshadowed any physical disparities between the men, and contributed to the jury's evaluation of the reasonableness of the officers' conclusion that Parker was Webb.

Further, the evidence at trial establishing the precise physical disparities upon which the Plaintiff now relies, as well as the relevant players' knowledge of those facts, was, at best, conflicting. In this regard, the Court finds that the jury was within its right to credit Canner's testimony that, although he was generally familiar with the brothers' appearances and knew their approximate heights, his identification on the date in question was based primarily on an evaluation of the individual's facial features – a method the police witnesses testified is the most reliable way to identify a suspect, and which evidently led Canner to determine that the individual looked "exactly like" Antonio Webb.

Similarly, the jury was free to credit Bulik's testimony that, despite also being familiar with Webb's appearance, he did not know the man's exact height. Although he had a general sense that

Webb was taller than his own 5' 7" frame, the jury could easily have determined that the circumstances of their encounter did not permit a reasoned comparison on that basis.

The only evidence of the men's weight disparity came in the form of testimony from Bulik, who claimed to know Webb was about 20 pounds heavier than Parker, and from police records indicating a similar differential. In this regard, cases have held that a mistaken arrest was reasonable where the weight discrepancy between an arrestee and a suspect was about 20 pounds. *See, e.g.,* *Caceres v. Port Auth.*, 631 F.3d 620, 622 n.1 (2d Cir. 2011); *Johnson*, 940 F. Supp. at 634.

Moreover, as it relates to the availability of police records confirming the brothers' weights, testimony showed that the measurements appearing on these records are estimates obtained from the subjects themselves, and are not to be relied upon as matters of factual precision. Nor, in any event, was the jury required to find it reasonable that the officers, faced with a quickly-unfolding situation involving a known dangerous suspect, would carefully consult such materials when other outward signs pointed to a common conclusion.

Finally, although Bulik testified that Webb had a lighter skin tone than Parker, the degree to which individuals subjectively evaluate such features varies, and the jury could have found the difference to be minimal, especially considering that both Bulik and Canner testified that they did, in fact, assess the individual's complexion in determining that it was Antonio Webb.

Also, the Court finds the Plaintiff's reliance on the hairstyles of the men to be unpersuasive because the jury heard testimony indicating that the Plaintiff was wearing his hood at the time he was misidentified. The jurors were free to credit this testimony and find that the Plaintiff's hairstyle was immaterial to the officers' analysis.

In sum, the jury was free to consider all this evidence with a view toward the Plaintiff's argument that the officers should have done more to compare the men's physical features before effectuating an arrest. However, they were simply not required to accept the Plaintiff's premise that,

in the context of a fast-paced street encounter, additional evaluative methods were reasonably available that would have produced a positive identification of Parker.

On the contrary, the jury could have reasonably concluded that, under these circumstances, the risk of letting Antonio Webb go outweighed the probability that a more thorough physical inspection might reveal their suspect to be the wrong person – particularly when Parker fled before any meaningful examination could have taken place. *See Hill*, 401 U.S. at 804 (noting that "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment"); *Gonzalez*, 2002 U.S. Dist. LEXIS 2749, at *17 ("Probable cause 'is a fluid concept – turning on the assessment of probabilities in particular factual contexts' "); *cf. Rosario*, 543 F.2d at 9 (Meskill, J., dissenting) (arguing that "no reasonable alternative" existed for officers who arrested the wrong person, as they were faced with the choice between letting a wanted suspect go – "hardly a viable choice" – and questioning the arrestee at the scene, whose protestations of innocence may themselves have been reasonably subject to disbelief).

Nor, importantly, was the jury required to credit the Plaintiff's self-serving opinion that he and his brother look nothing alike. On the contrary, the jury had the opportunity to compare the Plaintiff with a photograph of his brother and apparently did not find the differences between their appearances to be so grossly disparate as to compel the conclusion that confusing the two would be unreasonable under the circumstances. *See Caceres*, 631 F.3d at 622-23 (finding that a mistaken arrest was reasonable where, although the warrant specified a black man of dark complexion, the officers detained a light-skinned Hispanic man who, despite the racial disparity, matched the suspect's hair color; nearly matched his eye color; and was within two inches, 20 pounds, and five years in age of the suspect).

The Court also finds the Plaintiff's remaining arguments favoring a reversal of the jury's verdict to be unavailing. First, noting Canner's allegedly generic description of his suspect, the

Plaintiff relies on caselaw holding that "when the description [of a suspect] could have applied to any number of persons and does not single out the person arrested, probable cause does not exist." *Jenkins*, 478 F.3d at 90; *see Rosario*, 543 F.2d at 8.

In this regard, the Plaintiff argues that Canner's description was vague, in that it could have applied to a potentially large number of African-American youths in the North Park community, and therefore was insufficient to create probable cause.

However, other than noting that North Park has a large African-American population, the Plaintiff fails to identify any evidence suggesting that Canner's description did, in fact, apply to more than one person. By contrast, Canner testified that the portion of Riverside Boulevard on which he identified the Plaintiff was not particularly crowded or populated at the relevant times, and that the individual he described was the only African-American male in his 20s wearing a grey hooded sweatshirt and pants on that street.

Further, in addition to his race, gender, and clothing, Canner also signaled the individual's specific location; direction of travel; and that he had met up with two other males in the vicinity of the apartments on the 90-99 block of East Pine Street. Importantly, Canner indicated that, based on his own prior knowledge, experience, and evaluation of the individual, he believed it was Det. Roarke's suspect, namely, Antonio Webb. Thus, in the Court's view, this description was not so deficient as to require the conclusion, as a matter of law, that Bulik and Azueta acted unreasonably in following up on it. *See Beal v. City of New York*, No. 92-cv-718, 1994 U.S. Dist. LEXIS 5269, at *15 (S.D.N.Y. Apr. 15, 1994) ("An arresting officer's information need not be firsthand. An officer has probable cause to arrest if he received his information from some person who it seems reasonable to believe is telling the truth") (internal quotation marks and citation omitted).

This is especially true given that, although the individual described by Canner was ultimately misidentified, Canner's description successfully led Bulik and Azueta to the intended target within a matter of minutes. In other words, contrary to the Plaintiff's contention, the

challenged description *did* "single out the person arrested," and not "any number of [other] persons" in North Park that day. *See United States v. Jabbar*, 648 F. Supp. 1567, 1569-70 (S.D.N.Y. 1986) (finding a police officer's description of "a black male wearing a blue shirt with white trim in the company of another black male wearing a red and black plaid jacket on Lexington Avenue near 123rd Street was sufficiently detailed so that it would not fit a very large group of ordinary young men. Though an otherwise adequate description can be rendered unsatisfactory by the mere passage of time or the presence of other individuals fitting the description, neither situation was present in the facts at hand").

In any event, the Plaintiff's argument in this regard fails because it again focuses too narrowly on the physical description used by the police, apparently without appropriate regard for the fact that additional circumstances – some coincidental, some of the Plaintiff's own making – may have validly contributed to the existence of probable cause. As described above, even accepting the Plaintiff's premise that Canner's description alone did not provide probable cause for an arrest, the jury was nevertheless entitled to consider the events which followed – namely, the response to being called "Tony"; the foot pursuit; the direct references to "Ant" – and the criminal history of the suspect in ultimately concluding that the totality of the circumstances justified the officers' conduct.

Alternatively, the Plaintiff argues that the arresting officers failed to use reasonable caution in forming the belief that Parker was Antonio Webb. Again, this argument stems primarily from the Plaintiff's contention that Bulik and Azueta should have taken additional investigative steps to confirm the hooded individual's identity before making an arrest.

However, for substantially the same reasons as discussed above, the Court finds that this argument lacks merit. Namely, the Court finds that the reasonableness of the officers' investigation is to be determined by reference to the totality of the facts and circumstances known to the officers at the time of the arrest.

Although the Plaintiff would apparently prefer to ignore the fact that he ran from the police; and although the Court appreciates his observation that, in New York, running from the police is not itself a crime, *see People v. Howard*, 50 N.Y.2d 583, 586, 430 N.Y.S.2d 578, 408 N.E.2d 908 (1980), *cert. denied*, 449 U.S. 1023, 101 S. Ct. 590, 66 L. Ed. 2d 484 (1980); the jury was free to consider this important fact in assessing the reasonableness of the officers' response, and in doing so, reject the Plaintiff's theory that Bulik and Azueta acted unreasonably by failing to ask the Plaintiff his name or request his driver's license before effectuating an arrest.

Although it probably would have alleviated some of the confusion if the officers had immediately obtained information positively identifying Parker, the jury could have fairly concluded that his own conduct in running away and locking himself inside someone else's apartment considerably limited the appropriate responses available to the police. As noted above, there was an open question as to whether the officers' mistake was an understandable and reasonable response to the situation facing them at the time. *See Hill*, 401 U.S. at 804. And on this record, the Court finds that the jury was justified in concluding that the officers acted with the level of reasonableness called for by the particular factual scenario. *See Gates*, 462 U.S. at 232.

The Plaintiff's reliance on *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 386 (S.D.N.Y. 2009), does not alter the Court's reasoning. From that case, the Plaintiff draws the following principle: "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *Id.* (quoting *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). However, again, other than the physical disparities between the brothers, which the jury apparently found too minor under the circumstances to preclude a finding of probable cause, the Plaintiff fails to identify any concrete exculpatory facts to which Detective Bulik and Officer Azueta blinded themselves in their alleged zeal to make an arrest.

Finally, assuming that the initial arrest can be justified as a reasonable and understandable case of mistaken identity, the Plaintiff argues that any continued detention that occurred *after* the police positively identified him was unlawful because, upon learning that fact, the officers no longer had probable cause to believe he had committed the crime in question. Nevertheless, Parker was transported to the precinct and, according to him, placed in a custodial setting where he was forced to remain until he completed and signed the Form 79.

As it relates to Detective Bulik, this argument fails at the outset because the uncontroverted evidence shows that Bulik relinquished custodial control over Parker as soon as they exited Ms. Mann's apartment. The Plaintiff does not contend, and there is no evidence to establish, that Bulik was present for the positive identification that occurred en route to the precinct or was otherwise involved in the alleged continuation of the Plaintiff's detention.

As it relates to Officer Azueta, the Court finds that there was ample evidence to support the jury's determination that he did not act unreasonably in this situation. Although Parker's version of the relevant events involves an extended detention inside the police transport vehicle and, subsequently, an involuntary detention at the precinct, the evidence on this subject was again conflicting, and the jury could have reasonably credited the officers' account.

Namely, Officer Azueta and Det. Lt. Hayes testified that the vehicle was already in motion at the time Parker indicated that he was not Antonio Webb and a positive identification was made. There was testimony indicating that the distance from their location to the precinct was approximately half a mile; that it took only two or three minutes to arrive; and that the officers determined it would be difficult and unsafe to remove Parker's handcuffs inside the moving vehicle.

The Court pauses here to note that Officer Azueta, as a patrolman just four days into a temporary assignment in the Detective Division, was apparently the lowest ranking officer in the vehicle that day. Indeed, the evidence showed that Det. Lt. Hayes was not only Azueta's superior officer, but the commanding officer of all the detectives in Long Beach. As such, he directed Officer

Azueta to search Parker's person for identification, and he made the decision to proceed to the station house after realizing they had arrested the wrong person.

Therefore, the Court finds that the jury was not unjustified in rejecting the argument that, by failing to facilitate Parker's immediate release following the positive identification, Officer Azueta was somehow responsible for causing his continued detention. Indeed, to accept such a premise the jury would have had to find that Officer Azeuta was empowered to order Parker's release prior to their arrival at the precinct – a fact unsupported by any evidence in the record – or that he acted unreasonably in failing to do so in any event. In the Court's view, the jury's refusal to accept this theory was not against the weight of the evidence. *Cf. Vela v. White*, 703 F.2d 147, 152 (5th Cir. 1983) (concluding that "it would not be fair to force" a rookie police officer "to either violate a direct order or else stop and interrogate [a superior officer] as to the reasons for his order, at the risk of being held liable for damages for an unlawful arrest").

Further, there was testimonial evidence that, after arriving at the precinct's public entrance and immediately removing Parker's handcuffs, Hayes asked whether Parker would be willing to come inside and complete the necessary paperwork. Hayes testified that Parker willingly agreed to do so.

All of the officers testified that, although the DWI room is sometimes used to process arrestees and confine individuals suspected of crimes, it was also regularly used for a variety of non-custodial purposes. Further, the officers testified that Parker was not under arrest at that point, even if no one affirmatively advised him that he was free to go prior to his completion of the Form 79. In fact, Hayes and Canner both testified that if Parker had not agreed to complete the Form 79, they would have simply indicated in writing that he refused – a situation that evidently occurs somewhat frequently.

In any event, at best, the record establishes that Officer Azeuta played only a tangential role in the events that transpired back at the precinct. Hayes testified that Azeuta was present in the

DWI room "momentarily" and that it was Hayes who procured the Form 79; questioned the Plaintiff about the nature and extent of any injuries; asked him to sign the completed document; and then countersigned before escorting him out of the building.

Although Parker steadfastly disputed many of these facts at trial, and his attorney capably argued that the arrest should have been handled differently, it was for the jury to assess the credibility of the witnesses and weigh the relevant evidence. At this juncture, viewing the record in the light most favorable to the Defendants, the Court cannot say that the jury was unjustified in finding that Officer Azueta's conduct was objectively reasonable under the circumstances. *See Garris-Rivers v. Metro. Transp. Auth.*, No. 13-cv-9034, 2017 U.S. Dist. LEXIS 14912, at *10-*11 (S.D.N.Y. Jan. 26, 2017) (after arresting the plaintiff on a Long Island Railroad train for failing to provide proof of fare, the MTA police found a valid ticket in her possession during a post-arrest search but nevertheless held her for almost 21 hours in custody before she was arraigned and the charges dropped; following a defense verdict on her false arrest claim, the district court denied Rule 50 relief, finding that "[a]lthough the police conduct here may have been a harsh reaction to Plaintiff's uncooperative conduct, the jury considered and rejected arguments that Plaintiff's arrest should have been handled differently").

Therefore, the Court finds that the Plaintiff has not sustained his burden under Rule 50 of demonstrating that the trial record was so completely lacking in evidence to support the jury's probable cause determination that the verdict could only have been the result of sheer surmise and conjecture. Nor, in the Court's view, was the evidence of unreasonable conduct by Detective Bulik and Officer Azueta so overwhelming that no reasonable and fair-minded person could have arrived at a verdict in their favor.

Accordingly, the Plaintiff's motion for judgment as a matter of law is denied.

A.    **The Standard of Review**

A motion under FED. R. CIV. P. 59 "may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantive errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940).

As compared to the standard for judgment as a matter of law, "[t]he standard for granting a new trial under Rule 59 is less stringent, but still relatively high." *Stern v. Shammas*, No. 12-cv-5210, 2015 U.S. Dist. LEXIS 143194, at *4 (E.D.N.Y. Oct. 21, 2015) (quoting *Starr Indem. & Liab. Co. v. Am. Claims Mgmt.*, 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015)), *aff'd*, 665 F. App'x 27 (2d Cir. 2016) (Summary Order).

Namely, relief under Rule 59 is authorized even in situations where the evidence adduced at the trial was sufficient to support the jury's verdict. *See Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005). In addition, in evaluating a motion for a new trial, the Court "need not view the evidence in the light most favorable to the nonmoving party; instead, the court may weigh the evidence – including the credibility of witnesses – independently." *Starr Indem. & Liab. Co.*, 131 F. Supp. 3d at 188; *see Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 147 (2d Cir. 2001) ("Freed from the constraints of review that bind a court when deciding whether to grant judgment as a matter of law," in evaluating a motion for a new trial, "the district court [can] examine the evidence through its own eyes").

However, ultimately the question of "[w]hether to grant a new trial pursuant to Rule 59(a) is in the district court's sound discretion," *Clinton v. Brown & Williamson Holdings, Inc.*, No. 05-cv-9907,

2013 U.S. Dist. LEXIS 87204, at *5 (S.D.N.Y. June 20, 2013) (citation omitted), and should not be granted unless, in its independent judgment, the court determines that "'the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice,'" *Nimely*, 414 F.3d at 392 (quoting *Munafo v. Metro. Trans. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004)); *see DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) ("A court considering a Rule 59 motion for a new trial must bear in mind . . . that the court should only grant such a motion when the jury's verdict is 'egregious'") (quoting *Dunlap-McCuller v. Rise Organization*, 980 F.2d 153, 158 (2d Cir. 1992)).

With these standards in mind, the Court again turns to the parties' substantive contentions.

B.     **As to the Validity of the Jury Instructions**

The Plaintiff raises two discrete challenges to the Court's jury instructions, each of which he contends warrants a new trial.

First, the Plaintiff argues that the Court erred by failing to instruct the jury that he had a Constitutional right to flee from the police. In this regard, the Plaintiff contends that the failure of the Court to advise the jury that flight alone is insufficient to create probable cause, coupled with defense counsel's references to the Plaintiff's flight during his opening statement and closing argument, prejudiced him by misleading the jury into thinking that the Plaintiff's flight authorized the Defendants to arrest him.

Second, the Plaintiff challenges the Court's instruction regarding the fee arrangements pursuant to which he was treated by certain healthcare professionals. In particular, the evidence at trial showed that Dr. William B. Jones and Dr. Neil Henry rendered services to the Plaintiff in exchange for a lien against any amount the Plaintiff recovered in this lawsuit. The Court instructed the jury that it could consider these arrangements in assessing the credibility of the doctors and weighing the evidence of the Plaintiff's medical expenses.

In this regard, the Plaintiff first contends that the Court erred by failing to charge the jury that it would "be against public policy" and "create a foreseeable inequity" if he were denied such medical and counseling services because of his inability to pay for them at the time they were rendered.

The Plaintiff further contends that the Court's usage of the word "unusual" to describe these fee arrangements in its jury instruction, coupled with remarks by defense counsel questioning the witnesses' credibility in light of their apparent interests in the outcome of the litigation, prejudiced him by misleading the jury into thinking that there was something inherently improper about his motivations for bringing suit.

For the reasons that follow, neither of these arguments warrants a new trial.

I.       The Applicable Legal Principles

As noted above, "[a]mong the grounds for granting a new trial under Rule 59 is a finding that a jury instruction was erroneous, and that the error was not harmless." *Stern*, 2015 U.S. Dist. LEXIS 143194, at *5 (citing *Gordon v. New York City Bd. of Euc.*, 232 F.3d 111, 116 (2d Cir. 2000)); *see also Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994).

"Jury instructions are intended 'to give the jury a clear and concise statement of the law applicable to the facts of the case,'" *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F. Supp. 2d 256, 276 (S.D.N.Y. 2010) (quoting *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)).

However, since trial judges have "considerable discretion in the formulation and style" of their jury charges, *Patalano v. Am. President Lines*, 250 F. App'x 425, 427 (2d Cir. 2007) (Summary Order), an instruction is erroneous, and a new trial warranted, only if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law, *see Anderson*, 17 F.3d at 556.

"A court's charge must be tested by viewing it as a whole and will not be disturbed if it is 'correct and sufficiently covers the case so that a jury can intelligently determine the questions raised to it.'" *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 135 (2d Cir. 1999) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 552-53 (2d Cir. 1996); *see United States v. Gabinskaya*, 829 F.3d 127, 132 (2d Cir. 2016) ("As a general matter, no particular wording is required for a jury instruction to be legally sufficient, but rather, th[e] Court must 'look to the charge as a whole to determine whether it adequately reflected the law and would have conveyed to a reasonable juror the relevant law'") (quoting *United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2011)); *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 n.1 (2d Cir. 1998) ("emphasiz[ing] that the particular words used in a jury instruction may (depending on the circumstances) be less important than the meaning or substance of the charge as a whole").

On the other hand, an error is harmless "if the court is convinced that the error did not influence the jury's verdict." *Gordon*, 232 F.3d at 116.

Finally, where a Rule 59 motion is premised on an objection to a jury instruction, "FED. R. CIV. P. 51 requires the movant to have raised that objection before the jury retires in order to preserve the objection." *Henry v. Dinelle*, 929 F. Supp. 2d 107, 114 (N.D.N.Y. 2013), *aff'd*, 557 F. App'x 20 (2d Cir. 2014) (Summary Order).

Under Rule 51, "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." FED. R. CIV. P. 51(c)(1). Such an objection will only be deemed timely if: (1) it is made at the designated time for "object[ing] on the record and out of the jury's hearing before the instructions and arguments are delivered," *i.e.*, at the charging conference; or (2) where "a party was not informed of an instruction or action on a request before [the charging conference], and the party objects promptly after learning that the instruction or request will be, or has been, given or refused." FED. R. CIV. P. 51(c)(2)(A)-(B).

## 2.    Application to the Facts of this Case

### a.    The Failure to Charge on the Legality of Flight from the Police

In relevant part, the Court instructed the jury on the question of probable cause as follows:

> Under the laws of the State of New York, the defendants as police officers have the right to arrest the plaintiff without a warrant if they had probable cause for believing that the crime of robbery had been committed and that the plaintiff had committed that crime. The burden of proof is on the defendants to prove by a preponderance of the evidence that they had probable cause for believing that the crime of armed robbery had been committed by the plaintiff, Jesse [B]. Parker.
>
> Now, probable cause is not proof beyond a reasonable doubt or proof sufficient to convict. Neither, however, it is speculation or surmise. Probable cause exists when the facts and circumstances within the knowledge of the police officers at the time the arrest was made w[ere] sufficient to warrant a person of reasonable prudence to believe that the plaintiff was Antonio Webb who was the person to be arrested for the crime of armed robbery.
>
> In this case, probable cause existed if the police officers had knowledge of facts and circumstances sufficient to warrant a prudent police officer in believing that the plaintiff Jesse [B]. Parker was Antonio Webb, his brother, and the person sought to be arrested for armed robbery. The totality of the circumstances should be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest.
>
> In this case, probable cause existed when the police officers had knowledge sufficient to warrant a person of reasonable caution to believe that the person arrested w[as] Antonio Webb, who was the person sought for the crime of armed robbery.
>
> Probable cause requires only a substantial probability that the person they were arresting was Antonio Webb being sought for the crime of armed robbery. The question here is whether, on the facts in this case, reasonably prudent police officers would have believed the plaintiff to be Antonio Webb.
>
> In this case, probable cause requires the [police officers] to have knowledge or reasonably trustworthy information sufficient to warrant a person in the belief that the person they were arresting was, in fact, Antonio Webb. However, probable cause is a fluid concept and cannot be reduced to a neat set of legal rules.
>
> If the defendants had probable cause to believe the person arrested was Antonio Webb, then the plaintiff, Jesse [B]. Parker, was not thereby subjected to an unreasonable seizure.

(Tr. 1342-44)

In the Court's view, this instruction was neither erroneous nor misleading as to the relevant law.

The Plaintiff does not contend that the Court's given charge misstated any material aspect of the legal standard. Rather, he argues that the overall charge was prejudicially incomplete – that because his decision to run from the police became something of a focal point in the Defendants' theory of the case, he was entitled to have the jury instructed that such conduct is not itself sufficient to create probable cause for an arrest. The Court does not share this view.

As discussed above, it is true that, absent other indicia of criminal activity, New York law does not regard an individual's decision to run from the police as sufficient to create probable cause for an arrest. However, it is equally well-settled that an individual's flight from the police is a crucial factor that the jury is entitled to consider in assessing the reasonableness of the officers' decision to make an arrest.

Thus, recognizing the somewhat nuanced purposes for which the jury was entitled to consider this information, the Court advised the parties' counsel during the charging conference that, as a legal matter, "[b]oth [sides] are right," and declined to include an instruction that might unfairly influence the jury. (Tr. 1208-09)

Accordingly, the jury heard arguments from both counsel regarding the weight to be given to the fact that the Plaintiff ran from the police. However, the final version of the charge neither instructed the jury that flight is a factor weighing heavily in determining whether probable cause exists, nor that flight alone is insufficient to constitute probable cause, although, as described at length above, both of these statements would find support in the body of relevant caselaw.

While the Plaintiff's motivation for seeking the proposed instruction is self-evident, and understandable, in the Court's view, it would not have produced a more balanced or accurate explanation of the law than what was actually given. If anything, specifically instructing the jury that the Plaintiff's flight alone was insufficient to create probable cause may have misled the jury into believing that the Plaintiff's flight should be given less weight, or no weight at all, in the

probable cause analysis – an unacceptable result given the permissible uses of that information in defending this case.

Under these circumstances, the Court finds that the charge as a whole adequately reflected the law and would have conveyed to a reasonable juror the relevant standard for evaluating whether probable cause existed for an arrest.

Accordingly, to the extent that the Plaintiff seeks a new trial on this ground, his Rule 59 motion for such relief is denied.

        **b.**       **The Charge Regarding Medical Liens and the Court's Description of the Plaintiff's Fee Arrangement as "Unusual"**

The Plaintiff's challenge to the portion of the jury instruction dealing with the issue of medical liens fares no better. For the reasons that follow, the Court finds that his current contentions are not preserved for post-trial review; and even assuming they are adequately preserved, in the Court's view, the charge in this regard was lawful and proper.

As to the medical liens that Dr. Henry and Dr. Jones asserted against a potential damage award in this case, the Plaintiff requested that the Court charge the jury as follows:

> There is nothing inappropriate or impermissible about a medical professional placing a lien on an award or settlement for payment for services rendered to a Plaintiff for required treatment or for a medical professional to voluntarily waive any such payment for treatment. To deny an individual such as Plaintiff counseling treatment based on his inability to pay would be against public policy and create a foreseeable inequity where only Plaintiffs with access to medical insurance or the ability to pay for treatment privately would be permitted to have their treating medical professional testify as to the Plaintiff's diagnosis.

Pl. Rev. Supp. Req. to Charge, DE [89].

At the charging conference, the Court agreed to issue only the first half of this proposed charge, while also advising counsel that it planned to instruct the jury on the permissibility of considering the underlying fee arrangements in assessing the medical witnesses' credibility:

| | |
|---|---|
| THE COURT: | . . . Here is what I'm going to say. |

However, as you have heard, there was testimony by both Dr. Jones and Mr. Henry that if the plaintiff failed to prevail in this lawsuit, they would not be paid their respective bills. You may consider that unusual situation, not only in determining the amount of the medical bills but in your evaluation of the testimony of both Dr. Jones and Mr. Henry as to their facts and opinions.

That is what I'm going to say.

| | |
|---|---|
| MR. BREWINGTON: | And judge, obviously we did propose a charge concerning the lien. |
| THE COURT: | I saw that. I looked up the law on that and I think I am going to add something on that lien. |
| MR. BREWINGTON: | Yes. And there was a *Siegel v. Merit* case. That was the most recent Second Circuit case. |
| THE COURT: | Here is what I'm going to say. |

With respect to credibility of the medical witnesses, I instruct you that it is not impermissible under the law for a medical professional to place a lien on an award or settlement for payment for services rendered to a plaintiff for required treatment, or for a medical professional to voluntarily waive any such payment for treatment.

The rest of that I'm not going to charge.

| | |
|---|---|
| MR. BREWINGTON: | Understood. |

(Tr. 1219-23)

Consistent with this discussion, the Court ultimately charged the jury as follows:

If you have decided that plaintiff is not entitled to recover against either of the defendants, you should go no further. Only if you decide that he is entitled to recover against either or both of the defendants will you consider the measure of damages.

\* \* \*

The plaintiff has allegedly incurred a bill from Dr. William Jones in the sum of $30,757.55. Also, there was testimony from licensed certified social worker Neil Henry that his charge[s] were $75 per session for 71 sessions, in the sum of $5,325.

However, as you have heard, there was testimony by both Dr. Jones and Mr. Henry that if the plaintiff failed to prevail in this lawsuit they will not be paid their respective bills. You may consider that unusual situation, not only in determining the amount of the medical bills but in your evaluation of the testimony of both Dr. Jones and Mr. Henry as to their facts and opinions.

With respect to the credibility of the medical witnesses, I instruct you that it is not impermissible under the law for a medical professional to place a lien on an award or settlement for payment for services rendered to a plaintiff for required treatment, or for a medical professional to waive any such payment for treatment.

(Tr. 1357-58)

The jury returned a defense verdict on liability, and apparently did not reach the issue of damages. (Tr. 1392-93)

First, contrary to the Plaintiff's conclusory statement in his legal memorandum, *see* Pl. Memo of Law at 18, the Court finds that the Plaintiff's failure to timely object to the proposed jury instruction precludes the post-trial relief he seeks.

As the quoted portions of the trial transcript make clear, at the charging conference, the Plaintiff failed to raise any objection to the proposed jury instruction, let alone to "stat[e] distinctly the matter objected to" on the record and articulate "the grounds for the objection," as required by Rule 51(c)(1). Rather, the Plaintiff responded to the allegedly objectionable portions of the proposed charge, which were materially indistinguishable from those ultimately issued to the jury (including the inclusion of the word "unusual" to describe the Plaintiff's fee arrangements) by simply stating, "[u]nderstood."

Accordingly, the Plaintiff's failure to comply with the preservation requirements of FED. R. CIV. P. 51(c) precludes his present challenge.

Second, even assuming that the Plaintiff adequately preserved his challenge to this portion of the jury instruction, the Court would find any alleged error to be harmless, as a matter of law.

The Court specifically instructed the jury that it should consider the measure of the Plaintiff's damages *only if* it first determined that he was entitled to recover against either of the Defendants. Thus, it is reasonable to assume that the jury's defense verdict on the issue of liability precluded its further consideration of the Plaintiff's medical evidence, including the fee arrangements with his healthcare providers. Under these circumstances, the Court finds that

neither of alleged errors assigned to this portion of the jury charge could have influenced the jury's verdict, which evidently turned decidedly on the issue of probable cause. *See Gordon*, 232 F.3d at 116.

Third, this argument fails on the merits. Namely, the Plaintiff fails to identify how the Court's instruction regarding the permissibility of considering the medical witnesses' fee arrangements in assessing their credibility was erroneous or misleading as to the relevant law. In this regard, the Plaintiff neither denies that both Dr. Jones and Dr. Henry testified to having a financial interest in the outcome of this case, nor does he identify any principled reason why the jurors should not have taken that fact into account when assessing those witnesses' credibility.

On the contrary, the Court finds that this instruction was generally consistent with the Plaintiff's own proposed jury instructions, which included the following request to charge: "In considering the testimony of any witness, you may take into account . . . the [t]he witness' interest in the outcome of the case[.]" Pl. Req. to Charge, DE [73], at 10, ¶ 37; *see Henry*, 557 F. App'x at 22 (affirming denial of Rule 59 relief where, "[b]y requesting and approving the [challenged] instruction, [the plaintiff] invited the errors of which he now complains; He therefore cannot challenge them on appeal").

On this record, the Court discerns no basis for concluding that the instruction, as given, was inadequate for purposes of Rule 59.

Nor does the Court find that its decision to omit the Plaintiff's proposed language regarding the public policy rationale underlying the use of medical liens warrants a new trial.

Although defense counsel argued that the jury should scrutinize the Plaintiff's fee arrangements, this fact alone does not entitle the Plaintiff to a jury instruction counterbalancing that argument. This is especially true given that the Court substantially adopted the portion of the Plaintiff's requested charge that set forth the actual legal standard, including an instruction that the arrangements in question were not legally impermissible. In the Court's view, the extra commentary sought to be added by the Plaintiff was not necessary to adequately inform the jury on the law.

Lastly, in the Court's view, its decision to describe the subject fee arrangements as "unusual" did not detract from the meaning or substance of the charge as a whole. Initially, the Court's characterization was not misleading inasmuch as it was generally consistent with the testimony of Dr. Henry and Dr. Jones, both of whom testified that the fee arrangements they negotiated with Parker did not reflect their customary practice. (Tr. 649-50, 790-91, 798-99)

Further, as noted above, the Plaintiff's current contention that the word "unusual" somehow signifies a bias on the part of the Court is belied by his failure to raise such a concern amid substantial discussion on that subject at the charging conference. (Tr. 1220-23) *See Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 146 (E.D.N.Y. 2013) (noting that counsel's "failure to object to comments that she now asserts [in a Rule 59 motion] were sufficiently unfair and prejudicial so as to provide grounds for a new trial is . . . a relevant factor").

Accordingly, to the extent that the Plaintiff seeks a new trial on the ground that the Court's jury instructions were erroneous, his Rule 59 motion for such relief is denied.

## C.    As to the Alleged Misconduct by Defense Counsel

Finally, the Plaintiff contends that certain inappropriate remarks by defense counsel during his opening statement unfairly prejudiced the jury against him, thereby requiring a new trial.

### 1.    The Applicable Legal Principles

Prejudicial misconduct from counsel is a recognized ground for granting a new trial under Rule 59. *See Graham v. City of New York*, 128 F. Supp. 3d 681, 693 (E.D.N.Y. 2015).

Although "when 'arguing to a jury, counsel must properly have some latitude,' " *Claudio*, 955 F. Supp. 2d at 155 (quoting *Schwartz v. Nw. Airlines, Inc.*, 275 F.2d 846, 846 (2d Cir. 1960)), "the bounds of counsel's advocacy are circumscribed by considerations of the prejudice it might engender," *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 539-40 (2d Cir. 1992). "These limits are defined not

only by case law, but by that fundamental sense of fairness which guides our system of justice, and by the rules governing the ethical conduct of attorneys." *Id.* at 540.

"A court considering a motion for a new trial based on opposing counsel's misconduct must be mindful that 'not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial.' " *Graham*, 128 F. Supp. at 698 (quoting *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 477 (S.D.N.Y. 2010)). "Some misconduct is *de minimis* in the context of the entire trial, and some is promptly dealt with by the trial court's rulings and curative instructions." *Pappas*, 963 F.2d at 540; *Claudio*, 955 F. Supp. 2d at 149 (noting that a warning to counsel; a sustained objection; and/or a curative instruction may sufficiently counteract any risk of prejudice posed by attorney misconduct).

"For this reason, '[n]ot every improper or poorly supported remark . . . irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted.' " *Id.* at 155-56 (quoting *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 127 (2d Cir. 2005); *see Graham*, 128 F. Supp. at 698 (noting that "[a] new trial is warranted only where counsel's conduct prejudices the opposing party or unfairly influences the jury's decision"); *Pappas*, 963 F.3d at 540 (same).

"Thus, in evaluating a motion for a new trial based on counsel's alleged misconduct, the court 'must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments.' " *Graham*, 128 F. Supp. at 698 (quoting *Claudio*, 955 F. Supp. 2d at 144). "The relevant inquiry in assessing undue prejudice is whether there is a 'reasonable probability' that the jury's verdict was influenced by the improper conduct of counsel.' " *Claudio*, 955 F. Supp. 2d at 156 (quoting *Chang v. City of Albany*, 150 F.R.D. 456, 459 (N.D.N.Y. 1993)).

"Determining if counsel's conduct was so improper as to warrant a new trial is committed to the sound discretion of the trial court." *Graham*, 128 F. Supp. at 698. This is in recognition of "the trial court's superior vantage point when evaluating the possible impact of the alleged prejudicial conduct," including such circumstances as the "tones of voices, demeanor of witnesses and jurors and the like," which "occur in the course of an unfolding trial" but may not be fully captured in a printed record. *Pappas*, 963 F.2d at 540.

2.    **Application to the Facts of this Case**

The Plaintiff contends that, during his opening statement to the jury, defense counsel, namely, Robert M. Agostisi, Esq., made certain remarks that were prejudicial to the Plaintiff and tainted the remainder of the proceedings. In making this argument, the Plaintiff refers solely to the following passage from Mr. Agostisi's opening:

> MR. AGOSTISI: . . . You'll also hear plenty of motivation, plenty of reason about the plaintiff's motivation for this case. The plaintiff, Mr. Parker, he didn't seek treatment for the injuries that he only now alleges to have sustained. The evidence will show his attorney did. His attorney knew the providers and made fee arrangements directly with the providers—
>
> MR. BREWINGTON: Objection.
>
> THE COURT: Overruled. I'll allow it.
>
> MR. AGOSTISI: And wait until you hear about some of those fee arrangements. You'll figure out exactly why the providers had an incentive to keep treating and treating and treating Mr. Parker. It's because those providers don't get paid unless Mr. Parker does in this case.
>
> To that end, you'll hear that Mr. Parker hasn't paid these providers anything. Isn't that nice? Wouldn't you like to go to the doctor and not have to pay anything, not one co-pay. His attorney took care of everything for the benefit of this case.
>
> And to that end, you're going to hear that this case is nothing more than [an] extremely misguided effort to substitute a jury verdict from you with a steady job, which is something that the plaintiff has had trouble throughout his life holding down.
>
> At the end of this case, we're going to ask you to not allow Plaintiff to continue with what we see and what we believe you will see as a blatant shakedown and an abuse of the system.
>
> Lastly, let me say this. I mentioned – during the course of this case I'm going to get yelled at sometimes, all right, by the judge. I can tell from the pretrial conferences that it's just going to go that way for me. It's just going to be one of those cases.
>
> MR. BREWINGTON: Objection.

THE COURT: Sustained.

MR. AGOSTISI: What I need you to understand is that if that happens, please don't have it be a reflection on my clients or the case. If anything, that's a reflection on me and my advocacy. If I can take a moment to tell you about my advocacy for a second.

I mentioned at the beginning of that case [*sic*] that I'm a City attorney. That makes me a government employee. I'm working a flat rate. I don't get paid any more to do this trial.

MR. BREWINGTON: Objection.

THE COURT: Sustained.

MR. BREWINGTON: I'm asking for a curative on that, Judge. Curative.

THE COURT: Yes. Please ignore that statement, last statement by counsel. It's totally irrelevant, and you are not to consider it at all.

MR. AGOSTISI: I had a feeling that was going to happen.

Anyway, I'd like to explain why I'm here. This case was not outsourced to another lawyer to try this case. I've been with it since the beginning, and the reason why is this. I passionately believe in my clients' innocence. I passionately believe in my clients.

I passionately believe that they are the ones who have been wronged here. They've had their good names and reputations dragged through the mud.

MR. BREWINGTON: Objection.

THE COURT: Yes. Sustained.

Do you have anything else that's relevant to this case? If not, desist.

MR. AGOSTISI: As I was saying, I passionately believe in my clients. And at the end of this case, I'm 100-percent confident that you will passionately believe in their innocence as well. That's why at the end of this case, you will return the only verdict you can return in this case, which is a verdict for the defendants.

(Tr. 46-48)

There are three main aspects of this colloquy to which the Plaintiff now objects.

First are Mr. Agostisi's comments allegedly disparaging the Plaintiff's character and motivation for bringing this lawsuit, namely, his suggestion that the Plaintiff's claims are fabricated, and his rather plain statement that Parker is abusing the system by seeking to substitute a jury verdict for a steady job.

Second are Mr. Agostisi's comments regarding the Plaintiff's healthcare providers, namely, his skeptical description of the Plaintiff's fee arrangements, and his insinuation that Plaintiff's

counsel somehow engaged in devious conduct by referring Parker to healthcare providers and negotiating on his behalf for medical liens based on a potential jury award.

Third are Mr. Agostisi's comments regarding his own role in the trial, namely, his prediction that the Court would reprimand him for advocating too passionately for his clients, and his statement that, as a government attorney, he would be paid a "flat rate" for the trial.

However, other than labeling these remarks as "inappropriate," "prejudicial," and "misleading," the Plaintiff fails to set forth any plausible basis for concluding that, while perhaps indelicate at times, Mr. Agostisi's opening statement engendered actual prejudice against the Plaintiff or otherwise influenced the jury's verdict.

In assessing this situation, the Court evaluates these remarks in the context of the entire trial. In doing so, the Court finds it significant that, except for this portion of his opening statement, the Plaintiff fails to identify any other objectionable conduct by Mr. Agostisi during the weeklong proceedings. In the Court's view, this infrequency weighs against the relief sought.

The Court also notes that none of the challenged comments deals with what appears to have been the real, determinative issue before the jury, namely, whether, on the date in question, the Defendants acted reasonably in mistaking the Plaintiff for his brother. In this regard, to whatever extent the Plaintiff continues to argue that the Court and defense counsel cast a negative light on his fee arrangements with his healthcare providers, the Court reiterates that there is no reason to believe the jury considered that question in reaching its verdict.

Finally, the Court considers the manner in which these comments were treated in the presence of the jury. In this regard, the Plaintiff fails to establish, except through conclusory assertions to the contrary, that any of Mr. Agostisi's remarks were so inflammatory as to persist in the minds of the jurors after the Court sustained relevant objections and issued a curative instruction.

Therefore, in the Court's view, considering the totality of the circumstances, there is nothing in the challenged portion of defense counsel's remarks that would warrant a new trial. To the extent that the Plaintiff seeks Rule 59 relief on this basis, his motion is denied.

## V.    CONCLUSION

Based on the foregoing, the Court denies in their entirety the Plaintiff's motion pursuant to FED. R. CIV. P. 50 for a judgment as a matter of law and his motion pursuant to FED. R. CIV. P. 59 for a new trial.

The Clerk of the Court is respectfully directed to enter judgment consistent with this opinion, and to close this case.

It is **SO ORDERED:**

Dated:  Central Islip, New York
August 5, 2017

/s/ Arthur D. Spatt
ARTHUR D. SPATT
United States District Judge